IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OHIO

| | |
|---|---|
| DR. MICHAEL GARDNER : <br> 1951 Lakewood Road : Case No. <br> Cutler, Ohio  45724 : <br> : Judge <br> and : <br> : JURY DEMAND ENDORSED <br> MARY GARDNER : HEREON <br> 1951 Lakewood Road : <br> Cutler, Ohio  45724, : <br> : <br> Plaintiffs, : <br> : <br> v. : <br> : <br> STATE FARM FIRE AND : <br> CASUALTY COMPANY : <br> c/o Susan Krieger, Statutory Agent : <br> 1440 Granville Road : <br> Newark, Ohio  43093. : <br> : <br> Defendant. | |

## COMPLAINT

Now come Plaintiffs Dr. Michael and Mary Gardner (the "Gardners"), by and through their undersigned counsel, and state as their Complaint against Defendant State Farm Fire and Casualty Company as follows:

## THE PARTIES

1. Plaintiffs Michael and Mary Gardner (the "Gardners") are residents of Washington County, Ohio and own the property located at 1277 Taos Lane, Sugar Grove, Ohio 43155 that is the subject of this action.

2. Defendant State Farm Fire and Casualty Company ("State Farm") is, upon information and belief, an insurance company organized under the laws of, and domiciled

in, the state of Illinois. Upon further information and belief, State Farm's principal place of business is located in Bloomington, Illinois.

## JURISDICTION AND VENUE

3. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because it is an action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred in this district and the property that is the subject of the action is situated in this district.

## STATEMENT OF FACTS

5. In or about March 2013, State Farm issued a renewal certificate for Homeowner's Policy No. 70-BZ-C936-9 (the "Policy"), effective April 27, 2013 to April 27, 2014, for coverage of the property located at 1277 Taos Lane, Sugar Grove, Ohio 43155 (the "Property"). The Policy also included a replacement cost provision. (A copy of the Policy is attached hereto as Exhibit 1).

6. The Property is a vacation home in the Hide-A-Way Hills sub-division in Hocking County, Ohio that the Gardners visit several times per month.

7. On April 2, 2014, Dr. Gardner visited the Property and discovered several inches of standing water in the lower level, which had been caused by a burst pipe. That pipe had frozen due to the failure of a propane-fueled furnace that had stopped working due to what was eventually diagnosed as a faulty computer board.

8. The Property is a two-level home built into the side of a hill and has living space, including living rooms and bedrooms, on both levels.

9. At the time of the discovery, water was spraying out of the pipe and had already caused significant damage to the lower level ceiling, which eventually collapsed.

10. The Gardners immediately contacted their State Farm agent and on April 3, 2014 the agent told them that State Farm had a contract with Servpro for the cleanup of this type of loss and that the Gardners should contact Servpro directly. They immediately contacted Servpro of South Columbus/Fairfield County ("Servpro") to arrange for it to come to the Property and begin the cleanup.

11. The Gardners arranged for a family member to meet Servpro at the Property on April 4, 2014.

12. When the Servpro professionals arrived at the Property, they assessed the damage and realized the damage was far worse than they anticipated, at which time they contacted Mary Anne McLaughlin ("McLaughlin"), the State Farm claims adjuster assigned to the Gardners' claim.

13. After being apprised of the extent of the damage, McLaughlin instructed the Servpro professionals to leave the Property immediately with no further explanation to either Servpro or the Gardners.

14. As such, remediation did not begin immediately, which exacerbated the damage to the Property.

15. Because remediation, including the use of industrial dryers and dehumidifiers, did not begin immediately, due solely to McLaughlin's ordering Servpro off the Property, the standing water and the humidity created by it, soon caused virtually all the drywall, drywall ceilings and ceiling tiles throughout the house to become saturated with the water.

16. It eventually became so bad that water was dripping from the cathedral ceiling in the upstairs living room.

17. McLaughlin also did not immediately go out and inspect the Property herself because she told Dr. Gardner that she would not do so until all the water was removed.

18. McLaughlin did not tell Dr. Gardner how the Gardners were to remove the water since State Farm, through McLaughlin, had already ordered Servpro off the Property.

19. As noted above, the damage initially occurred because the furnace stopped working and the pipes froze and burst.

20. In a letter dated April 4, 2014, McLaughlin stated:

> There is a question whether State Farm Fire and Casualty Company is obligated to indemnify you under the policy for loss which is aleged [sic] to have occurred on or about April 02, 2014 . . . because:
>
> There is a question as to whether the origin and cause of the loss was accidental in nature.
>
> It is questionable whether there has been a loss caused by a peril insured against.
>
> It is questionable whether the bodily injury or property damage was caused by an occurrence as defined in the policy.

21. This letter, a copy of which is attached hereto as Exhibit 2, is dated only two days after the date that State Farm was notified of the loss and before anyone from State Farm, McLaughlin included, had even been to the Property.

22. This letter unfortunately began McLaughlin's determined, bad faith effort to deny the claim, notwithstanding the fact that all evidence compelled its payment.

23. Instead of addressing the devastating damage to the Property, McLaughlin demanded that the Gardners produce copies of their electric bills to prove that the damages were not caused because the electricity had been disconnected.

24. On or about April 5, 2014, the Gardners sent their October 2013 through April 2014 South Central Power bills to State Farm to prove they had been paid and that the electricity had not been disconnected.

25. Once the Gardners proved that they had paid their electric bills, McLaughlin then decided that the Gardners had failed to ensure that propane had been delivered and demanded that they prove that heat was "maintained in the home prior to and on the date of loss of April 3, 2014 [sic]." *See* McLaughlin's May 1, 2014 letter attached hereto as Exhibit 3.[1]

26. The Gardners also provided State Farm a copy of the invoice for the repair of the furnace.

27. All the while, standing water remained in the lower level and humidity continued to build throughout the house.

28. In fact, the humidity caused by the standing water, which remained solely due to McLaughlin's ordering Servpro away from the Property, caused the doors and windows in the house to swell shut so that they could not be opened to at least air out the house.

---

[1] The generally adversarial nature of McLaughlin's claims handling is well in evidence in the May 1st letter in which she references all of the Gardners' duties under the Policy while ironically not referencing a single one of her antics that continued to exacerbate the Property's damages. It should also be noted that the letter was addressed to the Gardners' attorney because McLaughlin's obfuscatory conduct from the outset compelled the Gardners to retain legal counsel from almost the beginning of the claims process.

29. Because State Farm was doing absolutely nothing to process the claim and rehabilitate the Property, all the while allowing the Property to deteriorate, the Gardners hired Servpro on their own and spent nearly $30,000 of their own money simply to dry out the Property and begin to remediate it.

30. Once the Gardners hired Servpro on their own, the company brought in several industrial humidifiers and blowers to dry out the house thoroughly.

31. After that was accomplished, the company reassessed the damage and determined that, due mainly to the buildup of humidity in the house caused directly by State Farm's ordering of Servpro to leave on April 4th, crucially delaying the beginning of the remediation process, essentially all of the drywall, drywall ceilings and ceiling tiles throughout the Property were not salvageable and had to be removed.

32. As a result, the Property is down to studs throughout, and remains that way today.

33. Servpro told Dr. Gardner that all the damage that Servpro remediated, and the damages that remain to be repaired, consisting mainly of reinstalling drywall and ceilings throughout the Property, was necessary because the walls and ceilings had become saturated with water due to the standing water and humidity caused by it.

34. That assessment is evidenced by Servpro's invoices detailing the repairs made thus far and the estimates to complete the repairs necessary to make the house habitable again. Copies of all those invoices and estimates were provided to State Farm during the claims process.

35. As noted, McLaughlin refused to even enter the Property to assess the damages thoroughly. She did not actually physically visit the property to inspect it until

June 2014, over two months after the date of loss and after Servpro had completed the initial remediation process.

36. In a letter dated July 15, 2014, approximately one month after McLaughlin finally deigned to physically inspect the Property, she again asked for the electric bills, which she had had since virtually the outset of the claim, instead of adjusting the claim and getting the Property restored to a habitable condition.

37. As a follow up, on August 5, 2014, the Gardners' lawyer Scott M. Deliman, wrote to McLaughlin seeking information on the claim. *See* Exhibit 4.

38. McLaughlin did not respond to that inquiry so Mr. Deliman sent a follow-up letter on August 15th. *See* Exhibit 5.

39. In a letter dated August 19, 2014 over four months after the loss, McLaughlin responded to Mr. Deliman's letter. That letter, attached as Exhibit 6, stated, in pertinent part:

> We are extending coverage for the accidental direct physical loss water portion of the claim to the basement. *However, the mold remediation is specifically excluded from the policy* . . . . Please contact me with the ages of the flooring, paint, and cabinets in the basement for depreciation purposes.

(emphasis added).

40. No part of the remediation process involved the presence of mold or mold remediation.

41. As noted, virtually all of the drywall, drywall ceilings and ceiling tiles at the Property had to be removed because they were saturated with water caused by humidity and were unsalvageable. There was no evidence that anything removed contained mold.

42. Because McLaughlin's August 19th Letter denied the claim as to all "mold" issues, Mr. Deliman sent a follow-up letter, dated September 2, 2014. That letter, attached hereto as Exhibit 7, states, in pertinent part:

> As part of the claim, my clients are seeking coverage for damage to the remainder of the residence that was caused by the *severe moisture and humidity at the residence*.

(emphasis added).

43. In response, McLaughlin, in a letter dated September 11, 2014, stated, among other things, that State Farm would not cover "damages to the upstairs of the home due to mold, mildew and rot and also to the walls and ceiling in the basement which are higher than 2' from the floor." A copy of that letter is attached hereto as Exhibit 8.

44. That letter from McLaughlin evidences that, despite all evidence to the contrary, she continued to deny reality, that is, that the cause of the damage was severe moisture and humidity *caused solely by her and State Farm's conduct, or lack thereof*, and stuck to her unsupportable position that there was mold damage at the Property.

45. Thus, State Farm has refused, and continues to refuse, to pay for damages, including those for which it was the sole cause, based on, among other actions, ordering Servpro to leave the Property prior to taking the immediate remediative measures that would have reduced and/or eliminated the damage, refusing to inspect the Property and get the restorative process started in April 2014.

46. Other than the remediative efforts that the Gardners paid for themselves, the Property has not been repaired and it has been and remains uninhabitable and has robbed the Gardners and their family of the enjoyment of the Property.

47. Furthermore, State Farm's claim denial was in bad faith because the basis of the denial, as stated in at least two letters from McLaughlin, was that the Policy did not cover mold damage and mold remediation and there was never any evidence of mold damage or repair of mold damage and no "mold remediation" took place.

## COUNT I – BREACH OF CONTRACT

48. Plaintiffs hereby incorporate the allegations of all the preceding paragraphs as though fully set forth herein.

49. A valid Policy contract existed at the time of the loss between State Farm and the Gardners and the loss was one covered under the terms of the Policy.

50. As such, the above actions and inactions of State Farm, its agents, representatives and/or employees, including but not limited to McLaughlin, constitute a breach of the terms of the Policy contract.

51. As a direct and proximate result of this breach, Plaintiffs have sustained losses, including but not limited to, property loss, inconvenience and the cost of bringing this action to enforce the terms of the Policy contract.

## COUNT II – BAD FAITH CLAIMS HANDLING

52. Plaintiffs hereby incorporate the allegations of all the preceding paragraphs as though fully set forth herein.

53. The above actions and inactions of State Farm, its agents, representatives and/or employees, including but not limited to McLaughlin, constitute bad faith claims handling because there was no reasonable basis to deny the claim.

54. As a direct and proximate result of this bad faith claims handling, Plaintiffs have sustained losses, including but not limited to, property loss, inconvenience and the cost of bringing this action.

**WHEREFORE**, Plaintiffs respectfully request judgment against State Farm as follows:

A. Compensatory damages in an amount in excess of $25,000.00;

B. Consequential damages in an amount in excess of $25,000.00;

C. Punitive damages; and

D. Attorney fees, costs incident to this suit, and such other relief as this Court shall deem appropriate under the circumstances.

Respectfully submitted,

FOX & FOX LAW CO., LPA

/s/ Michael W. DeWitt (3/23/15)
Michael W. DeWitt (0066896)
140 North High Street
Gahanna, Ohio  43230
(614) 532-3046
mike@foxandfoxlawco.com
Attorney for Plaintiffs

Plaintiffs demand a trial by a jury of eight members on all issues triable by right to a jury.

 /s/ Michael DeWitt (0066896)